# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 22-0503V

| | |
|---|---|
| KATHRYN T. WARD,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: September 12, 2024 |

*Matthew F. Belanger*, Faraci Lange, LLP, Rochester, NY, for Petitioner.

*Mallori Browne Openchowski*, U.S. Department of Justice, Washington, DC, for Respondent.

### **FINDINGS OF FACT AND RULING ON ENTITLEMENT**[1]

On May 6, 2022, Kathryn Ward filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine she received on September 27, 2019. Petition at ¶1, 3. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find that the onset of Petitioner's pain more likely than not occurred within 48 hours of his vaccination, and that she has satisfied all

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

of the requirements of a Table SIRVA claim. Therefore, Petitioner is entitled to compensation under the Vaccine Act.

## I. Relevant Procedural History

On July 26, 2023, Respondent filed a status report indicating that he was amenable to settlement discussions. ECF No. 24. The parties reached an impasse by August 23, 2023. ECF No. 23. Accordingly, on October 13, 2023, Respondent filed his Rule 4(c) Report. ECF No. 29. Respondent argues that Petitioner has failed to establish 48-hour onset as required for a Table SIRVA. Rule 4(c) Report at 6.

Petitioner filed a Motion for a Ruling on the Record on Entitlement and Damages ("Mot.") on October 13, 2023. ECF No. 33. Respondent filed his Response to Petitioner's Motion for a Ruling on the Record ("Resp") on December 18, 2023. ECF No. 36. Petitioner filed a reply ("Repl.") on December 19, 2023. ECF No. 37.

The matter of Petitioner's entitlement to compensation is now ripe for adjudication.

## II. Relevant Factual History

Petitioner received a flu vaccine in her left deltoid on September 27, 2019, during a prenatal appointment at her obstetrician's office in Pittsford, N.Y. Ex. 2 at 1-2. At the time, she was seven months pregnant with her first child. Ex. 1 at ¶4. She recalled that she woke up the following morning with "significant left shoulder pain and weakness such that it was difficult to move [her] arm, lift anything or pull open a door." *Id*. at ¶5.

Petitioner initially attributed her shoulder pain to the "joint and body aches" she had experienced during her pregnancy and believed it would resolve once she gave birth. Ex. 1 at ¶6. She treated her symptoms with ice, heat, and movement. *Id*. at ¶7. Petitioner recalled asking her obstetrician and a nurse about her left shoulder pain and being reassured that it would resolve in time with home treatment. *Id*.

On October 15, 2019 (18 days after vaccination), Petitioner had a pregnancy-related ultrasound. Ex. 6 at 77.[3] From November 18 through November 22, 2019 (52-55 days after vaccination), Petitioner was hospitalized for the birth of her child by c-section. *See* Ex. 3 at 465-72. Petitioner stated that after giving birth, her shoulder pain continued despite her other aches and pains going away. Ex. 1 at ¶8. On December 2, 2019 (66 days after vaccination and two weeks after giving birth), Petitioner returned to her

---

[3] Petitioner had routine prenatal appointments after her vaccination on October 10, 2019, October 21, 2019, October 28, 2019, November 4, 2019, and November 13, 2019. *See* Ex. 3 at 85-86. These appointments do not have separate records, and memorialize only the results of routine prenatal screenings an abbreviated notes. *Id*.

obstetrician for a post-natal appointment. Ex. 6 at 79. The record does not contain any reference to shoulder pain.

Petitioner recalled that her primary care provider ("PCP") phoned after her daughter was born, which prompted her to make an appointment to address her left shoulder pain. Ex. 1 at ¶8. Petitioner thus saw her PCP on December 4, 2019. Ex. 7 at 12. At this time, she reported that "in sept got flu [sic] at OB and the next day she had very bad pain." *Id.* She described the pain as "so intense she could not open doors." *Id.* She also reported that she had a c-section two weeks prior, was sleep deprived, and was getting assistance with breastfeeding. *Id.* at 14. On exam, Petitioner had reduced range of motion ("ROM") with pain at the end ranges. *Id.* at 15. An x-ray was ordered and Petitioner was referred to physical therapy. *Id.* The PCP believed that Petitioner had a "frozen shoulder that the pain limited her use of her arm and now it is difficult to use." *Id.*

On December 6, 2019, Petitioner met with a lactation consultant for assistance with breastfeeding. Ex. 3 at 976. Petitioner reported left shoulder pain that "started when she got a flu shot in September." *Id.* at 985. The same day, Petitioner had an initial physical therapy evaluation. Ex. 4 at 5. She reported that she "received a flu shot in September and since that time she has been experiencing L shoulder pain and soreness." *Id.* She stated that she "[was] having significant difficulty with holding and caring for her newborn." *Id.* Petitioner was assessed with decreased ROM and strength in her left shoulder, consistent with impingement and tendonitis. *Id.* Therapy goals were set for 30 days. *Id.* Petitioner had a total of seven PT treatments through January 8, 2020. *Id.* at 5-8. By discharge, Petitioner's symptoms had improved and she was independent with a home exercise program. *Id.* at 7.

On January 2, 2020, Petitioner saw an orthopedist for her left shoulder pain. Ex. 5 at 31. She reported that she had "pain since receiving a flu shot back in September 2019." *Id.* She reported her physical therapy treatment and stated that she used anti-inflammatories for pain. *Id.* On exam, Petitioner had reduced range of motion, reduced strength, and positive impingement testing. *Id.* at 32. X-rays were normal. *Id.* She was diagnosed with impingement syndrome and bursitis and given a cortisone injection. *Id.* at 32-33.

An MRI performed on February 12, 2020. revealed partial-thickness tearing, mild tendinosis, and significant edema. Ex. 3 at 1033-34. Petitioner returned to the orthopedist on February 14, 2020, to follow-up and review her MRI. 5 at 21. She was advised to continue conservative treatment, including a structured exercise program, and to return in six weeks. *Id.* 22.

On June 11, 2020, Petitioner returned to her orthopedist. Ex. 5 at 15. Petitioner now reported that although the cortisone injection had improved her symptoms, she was "never 100% pain-free." *Id.* She stated she noticed an increase in pain after moving boxes

and "has been in increased pain over the past few weeks." *Id*. She reported that she continued doing her home exercises. *Id*. Petitioner was given a second cortisone injection and advised to continue her exercise program. *Id*. at 17.

On August 10, 2020, Petitioner got a second opinion from a different orthopedist. Ex. 3 at 1083. She stated that she had received a flu vaccine in September 2019. *Id*. Although she had no pain at the time on the injection, "the next day, she had severe pain and weakness." *Id*. She reported that she "could not move her arm she was in so much pain." *Id*. She reported that after her daughter was born "a lot of her body pain went away except for [her] left shoulder." *Id*. She stated that her second cortisone injection had "helped her the most," but that she had stopped her exercise program because "it seems to aggravate her shoulder." *Id*. On exam, Petitioner could "slowly perform all range of motion within normal limits," but felt "slightly tight" at the end range. *Id*. The orthopedist assessed an inflammatory reaction after a flu shot. *Id.* at 1084. He recommended another MRI, and possibly a third cortisone injection, both of which Petitioner declined. *Id*.

On October 9, 2020, Petitioner requested an opinion about whether getting another vaccination could worsen her shoulder symptoms. Ex. 3 at 1116. She was advised that she could receive the flu vaccine in her gluteus. *Id*. at 1115.

Petitioner did not seek any further treatment for her left shoulder pain.

### III.     Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as

incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### IV.     Findings of Fact – Onset

Respondent argues that Petitioner has failed to provide preponderant evidence that the onset of her pain began within 48 hours after her vaccination for two main reasons: (1) Petitioner waited 68 days after her vaccination to seek treatment for her left shoulder pain, and (2) she had multiple medical appointments in that two-month period where she did not report any shoulder pain. Neither argument defeats a finding of Table onset in this case.

First, Petitioner's two-month delay in seeking treatment is modest in comparison to other SIRVA petitioners who were nevertheless deemed to have established 48-hour onset. *See e.g. Winkle v. Sec'y of Health & Human Servs.,* No. 20-0485V, 2021 WL 2808993 (Fed. Cl. Spec. Mstr. 2021) (finding onset after a nearly five-month delay); *Welch v. Sec'y of Health & Human Servs.* No. 18-0660V, 2020 WL 7483129 (Fed. Cl. Spec. Mstr. 2020) (finding onset after more than three- and one-half-month delay). And Petitioner has provided a reasonable explanation for her delay. She explained that although she "woke up the morning after getting the flu shot," with "significant left shoulder pain and weakness such that it was difficult to move [her] arm, lift anything or pull open a door," she initially believed her pain was related to her pregnancy and would resolve after she gave birth. Ex. 1 at ¶5-6. As her pain continued, Petitioner states that she asked her obstetrician and a "nurse at a birth seminar" about her pain and was reassured that the pain should resolve without treatment. *Id*. at ¶7.

In fact, the record of Petitioner's actions is consistent with her affidavit testimony. Petitioner sought treatment for her shoulder pain very soon after giving birth – less than two weeks after being released from the hospital – while she was recovering from surgery and caring for a newborn. *See* Ex. 3 at 465; Ex. 7 at 12. Further, from the time she first sought treatment, Petitioner consistently related her shoulder pain as beginning with her flu shot, and at times, specifically reported that the onset of her pain occurred within 48 hours of her vaccination. *See* Ex. 7 at 12 (Petitioner reported that "in sept [sic] got flu at OB and the next day she had very bad pain" - "so intense she could not open doors."); Ex. 3 at 985 (Petitioner reported left shoulder pain that "started when she got a flu shot in September."); Ex. 4 at 5 (Petitioner reported that she "received a flu shot in September and since that time she has been experiencing L shoulder pain and soreness."); Ex. 3 at 1083 ("Petitioner stated that she received a flu shot in September 2019, and "the next day, she had severe pain and weakness."). While some of these records lack perfect specificity, Petitioner need only preponderantly establish that her pain "more likely than not" began within 48 hours of her vaccination.

Second, the intervening medical appointments during the treatment gap do not prevent a Table onset finding. Respondent notes that Petitioner had "four other medical visits where no concerns for her shoulder were raised," including "just two days prior to discussing her left shoulder with her PCP she presented for a comprehensive postpartum visit with her OBGYN which included a physical exam." Resp. at 7. But those intervening treatments related specifically to ger pregnancy and the birth of her child. Thus, the October 15, 2019 visit was solely for an ultrasound of Petitioner's child – and the record contains notes only of the ultrasound findings. Ex. 6 at 77. The record of October 14, 2019 appears to be the receipt of copies of records sent to the hospital where she intended to deliver her child, rather than a medical appointment. *See* Ex. 3 at 420-459.

Respondent also points to the records from the hospital from November 18-22, 2019, when Petitioner gave birth via c-section. Ex. 3 at 465-72. Respondent puts significant weight on a December 2, 2019 postpartum visit with Petitioner's obstetrician – since a physical examination was conducted but did not identify shoulder pain. Ex. 6 at 79. However, that physical exam was limited and did not include any musculoskeletal examination. *Id*. at 81 (exam included only constitution, chest, and abdomen). Further, Petitioner has stated that she did, in fact, mention her shoulder pain to her obstetrician during at least one of her prenatal appointments and was reassured that her pain would resolve with home treatments. Ex. 1 at ¶7. Although not raised by Respondent, Petitioner had additional prenatal appointments after her flu shot - on October 10, 2019, October 21, 2019, October 28, 2019, November 4, 2019, and November 13, 2019. *See* Ex. 3 at 85-86. The records of those appointments were also limited to routine screenings and abbreviated notes on a pre-printed "prenatal flowsheet." *Id*. Under such circumstances, it is reasonable that Petitioner would not mention shoulder pain during her pre- and postnatal care, or that the provider would not have recorded a brief conversation like Petitioner alleges occurred.

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

## V.     Ruling on Entitlement

### A.     *Requirements for Table SIRVA*

I have found that Petitioner has preponderantly established that her pain began within 48 hours after her flu vaccination. 42 C.F.R. § 100.3(c)(10)(ii). Respondent has not contested Petitioner's proof on the remaining elements of a Table SIRVA. *See* 42 C.F.R. § 100.3(c)(10)(i), (iii), (iv); Rule 4(c) Report at 5-7; Resp. at 5-7. Accordingly, I find that Petitioner has provided preponderant evidence to establish that she suffered a Table SIRVA injury.

### B.     *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The record shows that Petitioner received an influenza vaccine in her left deltoid on September 27, 2019 in Pittsford, NY. Ex. 2 at 1-2; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that she has not filed any civil

action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. *See* Ex. 1 at ¶17; Section 11(c)(1)(E) (lack of prior civil award). Finally, it is undisputed that Petitioner continued treating her vaccine-injury through August 10, 2020, which is more than six months after her vaccination on September 27, 2019. Ex. 3 at 1083; Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master